Mobil Pipe Line Company, Petitioner *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

Mele Construction Company, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

Argued June 5, 1981, before Judges MENCER, CRAIG and MACPHAIL, sitting as a panel of three.

*Ralph G. Wellington,* with him *Carl A. Salano, Schnader, Harrison, Segal & Lewis,* for petitioner, Mobil Pipe Line Company.

*Thomas M. Hart,* for petitioner, Mele Construction Company, Inc.

*Donald A. Brown,* Assistant Attorney General, for respondent.

OPINION BY JUDGE MENCER, October 8, 1981:

These consolidated appeals have been brought from an order of the Environmental Hearing Board (EHB)

imposing civil penalties on Mele Construction Company, Inc. (Mele), in the amount of $3,500, and Mobil Pipe Line Company (Mobil), in the amount of $5,000, for violating Sections 301 and 307 of The Clean Streams Law (Act),[1] Act of June 22, 1937, P.L. 1987, *as amended*, 35 P.S. §§691.301, .307, and regulations of the Department of Environmental Resources (Department). We affirm the EHB's order as it pertains to Mele but reverse as it pertains to Mobil.

This case arose from the accidental discharge, on October 3, 1975, of approximately 98,500 gallons of gasoline into the Lackawanna River from an 8-inch pressure gasoline pipeline in Moosic Borough, Lacka-

---

[1] Section 301 provides:

No person or municipality shall place or permit to be placed, or discharged or permit to flow, or continue to discharge or permit to flow, into any of the waters of the Commonwealth any industrial wastes, except as hereinafter provided in this act.

Section 307 provides, in pertinent part:

(a) No person or municipality shall discharge or permit the discharge of industrial wastes in any manner, directly or indirectly, into any of the waters of the Commonwealth unless such discharge is authorized by the rules and regulations of the department or such person or municipality has first obtained a permit from the department. For the purposes of this section, a discharge of industrial wastes into the waters of the Commonwealth shall include a discharge of industrial wastes by a person or municipality into a sewer system or other facility owned, operated or maintained by another person or municipality and which then flows into the waters of the Commonwealth.

. . . .

(c) A discharge of industrial wastes without a permit or contrary to the terms and conditions of a permit or contrary to the rules and regulations of the department is hereby declared to be a nuisance.

The parties have stipulated that gasoline is an "industrial waste" within the meaning of Section 1 of the Act, 35 P.S. §691.1, and is therefore "pollution."

wanna County. The pipeline has been owned and operated by Mobil since its construction in 1947 or 1948. In 1971, the Lower Lackawanna Valley Sanitary Authority (Authority) contacted Mobil regarding the crossing of its pipeline by the Authority's proposed sewer line beneath the river. Mobil consented to the crossing, on the condition that it receive prior notification of any construction activity near the pipeline, in order that it might provide personnel to locate the pipeline and supervise excavation near it. The Authority agreed.

In April 1975, Mobil preliminarily located and staked the path of the pipeline for the Authority's engineers and contractors. At that time, it was determined that the pipeline did not traverse the river in a straight line but made an abrupt turn under the river several feet from its east bank. In May 1975, Mobil was notified that Mele, the Authority's contractor, would be engaged in construction activity in the area of the pipeline. During those times when Mele was engaged in installing the sewer line underneath the gasoline pipeline, Mobil maintained a supervisor at the construction site, during all working hours, who supervised the excavation in the area of Mobil's pipeline. Locating and uncovering the pipeline was completed by hand under Mobil's supervision. The EHB determined that the Mobil pipeline was between 2 and 3 feet below the bottom of the riverbed. Mobil's supervisor remained on the site to supervise the excavation for 5 days, until May 21, 1975.

While laying the sewer line, Mele inadvertently knocked some protective coating off the gasoline pipeline. This accident required that an additional section of pipeline be exposed in order to repair it. A 10-to-15-foot section of the pipeline was exposed to restore the coating. That portion of the pipeline

which was uncovered disclosed the bend in the line near the east bank of the river. Mr. Sam Mele, the superintendent of Mele, was present when that section of the pipeline was exposed and the bend in the line was visible to Mele employees. Before leaving the construction site on May 21, 1975, Mobil's supervisor asked Mr. Mele to contact Mobil if Mele intended to do any further work in the area of the pipeline, since it was highly pressurized and therefore dangerous.

On October 3, 1975, an employee of Mele was operating a backhoe in the area of the pipeline. He was performing surface restoration work which included dressing and grading the riverbank. Mobil did not have a supervisor at the construction site during the surface restoration work because it was not notified that any work was to take place in the area of the pipeline. The backhoe struck the pipeline, causing it to rupture. The backhoe operator stated that he did not know the pipeline was there.

At the time the accident occurred, a permanent marker on the east shore of the Lackawanna River indicated the location of the pipeline in the vicinity. There was also a permanent marker on the west side of the river which was visible from the scene of the accident. Evidence in the record discloses that the markers were attached to posts extending approximately 3 feet from the ground and included the words "Warning Petroleum Pipeline." The markers were approximately 12 inches long by 7 inches high and included a toll-free number with which to contact Mobil. The existence and location of those permanent pipeline markers were known to Mele and were visible to its agents and employees on the date of the rupture. There was also a third permanent marker on a nearby Turnpike bridge abutment which was visible from the scene of the accident.

Mobil originally put a permanent marker in the river at the bend in the pipeline in April 1975. The EHB concluded that this marker may have been moved or otherwise destroyed by Hurricane Eloise, which caused high water and flooding on September 30, 1975. Mobil further staked out the pipeline in May 1975 using wooden stakes driven into the sand of the riverbanks. These, however, were not in place on the date of the accident. Mobil discovered the rupture during a regularly conducted inspection flight over the pipeline route. Mele concurrently notified Mobil of the accident. Within a few hours after the rupture, Mobil attempted to turn off the gasoline to the ruptured pipeline by turning two valves which were located at 1 and 3 miles from the rupture. Gasoline, however, continued to flow into the river for several hours after the line was shut off. The pipeline was operational the following day, and all repair work was completed by October 10, 1975.

The EHB concluded that Mele violated the Act by causing the discharge of the gasoline into the river. Mele's negligence was based upon its knowledge of the location and path of the pipeline and upon its failure to notify Mobil of its work near the area of the pipeline on October 3, 1975. The EHB concluded that Mobil violated the Act by permitting, through its negligence, the discharge and continuing discharge of gasoline into the river. Mobil's liability was based upon the EHB's determination that it failed to comply with federal regulations governing the transportation of hazardous substances through pipelines.

In this appeal, Mele contends that several of the EHB's findings of fact are unsupported by substantial evidence and were, therefore, improperly relied upon by the EHB in reaching its conclusions of law. Mobil contends that the EHB erred in determining that it failed to comply with United States Department of

Transportation regulations concerning the transportation of liquids by pipeline. We reject Mele's contention but agree with Mobil's contention.

## I

Mele contends that several of the EHB's findings of fact are unsupported by substantial evidence. This contention is without merit. Findings of fact 10 and 13 are essentially identical to stipulated facts 11 and 14. Mele may not now contend that facts to which it stipulated are unsupported by substantial evidence.

Mele takes issue with finding of fact 17 because it states that a Mele employee admitted to having "hooked" into the gasoline pipeline. This finding is amply supported by the testimony of Mr. Leonard C. Insalaco, a water quality specialist with the Department who spoke with three Mele workmen at the scene of the accident. Mele, moreover, does not dispute that it struck the pipeline and thereby caused the rupture. Mele's negligence stems, in large measure, from its failure to notify Mobil before resuming excavation in the area of the pipeline.[2] The manner in which the

---

[2] According to the Act of December 10, 1974, P.L. 852, 73 P.S. §§176-182, effective in 120 days, Mele was conducting excavation work on October 3, 1975. Section 1, 73 P.S. §176, defines "excavation work" as

the use of powered equipment or explosives in the movement of earth, rock or other material, and includes but is not limited to augering, backfilling, blasting, digging, ditching, drilling, grading, plowing-in, pulling-in, ripping, scraping, trenching and tunneling; but shall not include such use in agricultural operations or for the purpose of finding or extracting natural resources.

Section 5, 73 P.S. §180, required that Mele notify Mobil before resuming excavation. That section provides, in pertinent part:

It shall be the duty of each contractor who intends to perform excavation or demolition work at a site within a political subdivision:

. . . .

rupture occurred, whether by hooking, crushing, or otherwise, does not obviate Mele's liability.[3]

Mele argues that finding of fact 34[4] is unsupported because of testimony that the marker was removed by excavation in June 1975. Mele relies on the testimony

---

(2) Not less than three working days prior to the day of beginning such work, to request the information prescribed by subclauses (ii) and (iii) of clause (5) of section 2 [73 P.S. §177] from each such user's office designated on the designer's drawing or on the list of users obtained pursuant to clause (1) of section 4 [73 P.S. §179].

Mele is a contractor as defined in the Act of December 10, 1974. Section 1 states: " 'Contractor' means any person who or which performs excavation or demolition work for himself or for another person."

Section 2 of the Act of December 10, 1974, 73 P.S. §177, provides, in pertinent part:

It shall be the duty of each user:

. . . .

(5) Not more than two working days after receipt of a request therefor from a contractor or operator who identifies the site of excavation or demolition work he intends to perform, to inform him of:

(i) the location of any of the user's lines at such site;

(ii) the cooperative steps which the user may take, either at or off the excavation or demolition site, to assist him in avoiding damage to its lines;

(iii) suggestions for procedures that might be followed in avoiding such damage.

Mobil is a user as defined in the Act of December 10, 1974. Section 1 states: " 'User' means the public utility, municipal corporation, municipality, authority, rural electric cooperative or other person who or which uses a line to provide sevice to one or more consumers."

[3] Although Mele initially alleges that finding of fact 18 is unsupported by substantial evidence, it specifically states in its brief that it does not dispute that finding. Therefore, the issue of the sufficiency of finding 18 has been waived.

[4] Finding of fact 34 states:

Mobil originally put a permanent marker at the bend of the pipeline in the river in April 1975, but this marker was not in place on the date of the rupture. This 'perma-

of Mr. Charles Tietsworth, a Mobil pipeliner, to support this contention. Mr. Tietsworth stated that a permanent marker was placed at the bend in the pipeline when Mobil originally staked the line in April 1975 and that it was put back after all the work was done. Evidence in the record is not inconsistent with the EHB's finding that Hurricane Eloise may have removed or otherwise destroyed a permanent marker of the bend in the pipeline. In any event, the absence of the marker cannot absolve Mele of liability because it had actual knowledge of the location of the bend in the pipeline, stemming from direct observation.

Mele contends that finding of fact 36,[5] which states that the marker placed on October 10, 1975 was "in the river," is improper because of evidence indicating that it was "in the riverbank." However, the exact location of a marker placed 7 days after the accident which caused the rupture is without significance as to Mele's negligent conduct on October 3, 1975.

Finally, Mele takes issue with finding of fact 38[6] that the gasoline pipeline was between 2 and 3 feet below the bottom of the riverbed. There is, however, substantial evidence in the record to support that finding. Mr. Insalaco also testified that he did not think that the pipeline "was any more than two to three feet below the bed of the river at most." While there was conflicting testimony concerning the depth of the gasoline pipeline, it was within the EHB's discretion to accept the testimony that it determined to be most credible.

nent' marker may have been moved or otherwise destroyed by Hurricane Eloise which caused high water and flooding on September 30, 1975.

[5] Finding of fact 36 states: "On October 10, 1975, after the spill, Mobil placed a permanent marker in the river locating the bend in the pipeline."

[6] Finding of fact 38 states: "The Mobil pipeline was between two and three feet below the bottom of the river bed."

The findings of fact which Mele now challenges are either acknowledged, undisputed, or supported by substantial evidence. Since those findings are consistent with the EHB's conclusion that Mele violated the Act, we cannot reverse the EHB's adjudication as to Mele.

## II

Mobil argues that the EHB erroneously concluded that it failed to comply with United States Department of Transportation regulations governing the transportation of liquids by pipeline, found at 49 C.F.R. §195.248 (1975), pertaining to pipeline depth, 49 C.F.R. §195.260 (1975), pertaining to pipeline valves, and 49 C.F.R. §195.410 (1975), pertaining to pipeline markers.[7] We agree. While the EHB care-

---

[7] 49 C.F.R. §195.248 (1975) provides, in pertinent part:

(a) Unless specifically exempted in this subpart, all pipe must be buried so that it is below the level of cultivation. Except as provided in paragraph (b) of this section, the pipe must be installed so that the cover between the top of the pipe and the . . . river bottom . . . complies with the following table:

| Location | Cover (Inches) | |
| --- | --- | --- |
| | For normal excavation | For rock excavation[1] |

[1] Rock excavation is an excavation that requires blasting or removal by equivalent means

| | | |
| --- | --- | --- |
| . . . . | | |
| Crossings of bodies of water with a width of at least 100 feet from high water mark to high water mark | 48 | 18 |
| . . . . | | |
| Any other area | 30 | 18 |

(b) Less cover than the minimum required by paragraph (a) of this section and §195.210 may be used if—

(1) It is impracticable to comply with the minimum cover requirements; and

(2) Additional protection is provided that is equivalent to the minimum required cover.

fully refrained from deciding whether Mobil violated those regulations, it clearly applied the requirements they enunciate to Mobil's pipeline and relied solely upon that application to find Mobil liable for negli-. gent conduct under the Act. This was error.

The regulations in question were first issued on October 4, 1969 and, since that time, have been periodically updated and reissued. Subpart D of Part 195, Section 195.200 *et seq.*, is entitled "Construction." It

---

49 C.F.R. §195.260 (1975) provides:

A valve must be installed at each of the following locations:

(a) On the suction end and the discharge end of a pump station in a manner that permits isolation of the pump station equipment in the event of an emergency.

(b) On each line entering or leaving a tank farm in a manner that permits isolation of the tank farm from other facilities.

(c) On each main line at locations along the pipeline system that will minimize damage from accidental product discharge, as appropriate for the terrain in open country or for the location near cities or other populated areas.

(d) On each lateral takeoff from a trunk line in a manner that permits shutting off the lateral without interrupting the flow in the trunk line.

(e) On each side of a water crossing that is more than 100 feet wide from high-water mark to high-water mark unless the Secretary finds in a particular case that valves are not justified.

(f) On each side of a reservoir holding water for human consumption.

49 C.F.R. §195.410 (1975) provides:

(a) Except as provided in paragraphs (b) and (c) of this section, each carrier shall place and maintain line markers over each buried line in accordance with the following:

(1) Markers must be located at each public road crossing, at each railroad crossing, and in sufficient number along the remainder of each buried line so that its location is accurately known.

is the subpart which contains two of the regulations, 49 C.F.R. §§195.248 and 195.260, with which the EHB found Mobil not to be in compliance. Section 195.200[8] outlines the scope of the entire subpart and makes it clear that was intended to apply only to pipeline constructed, relocated, replaced, or changed after October 4, 1969. Mobil's pipeline was constructed in 1947 or 1948 and last relocated in 1954. The language of the subpart title and its scope section indicates that the

---

(2) The marker must state at least the following: 'Warning' followed by the words 'Petroleum (or the name of the commodity transported) Pipeline' (in lettering at least 1 inch high with an approximate stroke of one-quarter inch on a background of sharply contrasting color), the name of the carrier and a telephone number (including area code) where the carrier can be reached at all times. Markers at navigable waterway crossings must also contain the words 'Do Not Anchor or Dredge' with lettering not less than 12 inches high with an approximate stroke of 1 3/4 inches on a background of sharply contrasting color.

(b) Line markers are not required in heavily developed urban areas such as downtown business centers where—

(1) The placement of markers is impracticable and would not serve the purpose for which markers are intended; and

(2) The local government maintains current substructure records.

(c) Line markers that have been installed before April 1, 1970, may be used until April 1, 1975.

(d) Each carrier shall provide line marking at locations where the line is above ground in areas that are accessible to the public.

[8] 49 C.F.R. §195.200 provides:

This subpart prescribes minimum requirements for constructing new pipeline systems with steel pipe, and for relocating, replacing, or otherwise changing existing pipeline systems that are constructed with steel pipe. However, this subpart does not apply to the movement of pipe covered by §195.424.

regulations contained in the subpart were not designed to automatically and retroactively render all pipelines constructed prior to 1969 in violation thereof. Such a construction would be extreme. The federal regulations, in Subpart D, relied upon by the EHB to impose liability on Mobil, do not define a standard of care with which Mobil was required to comply in this instance.

The EHB also indicated that Mobil failed to comply with 49 C.F.R. §195.410 (1975), pertaining to the location and requirements of pipeline markers. The permanent markers on the east and west shores of the river did, however, comply with all material requirements of that regulation. Evidence in the record shows that the markers stated, "Warning," in large white letters set against a red background and, directly beneath that, "Petroleum Pipeline," in white letters set against a blue background. They included a toll-free number with which to contact Mobil and gave the complete name of the pipeline operator. Although the markers did not contain the words "Do not anchor or dredge," that requirement is not material here.

The record is replete with evidence of Mobil's efforts to stake and restake the pipeline path with temporary and permanent markers, in addition to the markers required to satisfy the federal regulation. Those efforts provided Mele with actual notice of the exact path of the pipeline and of the location of the bend in the line. The strictest compliance with the federal regulation could not have achieved more adequate notice. The accident of October 3, 1975 was, moreover, not caused by anchoring or dredging but by surface restoration work. Absolute compliance with the regulation, therefore, would not have warned against or prevented the type of work which caused the accident. Furthermore, the violation of a statute or regulation will not create liability unless that vio-

lation is the efficient cause of the injury. *Snyder v. Macaluso,* 204 F. Supp. 370 (W.D. Pa. 1962).

In its decision, the EHB opined that Mobil should have inspected its pipeline within two days of Hurricane Eloise on September 30, 1975 to determine whether its marker at the pipeline bend was still in place. Despite its heavy reliance on federal regulations, the EHB ignored the requirements pertaining to the monitoring and inspection of pipeline embodied in 49 C.F.R. §195.412 (1975).[9] The record reveals that Mobil complied fully with the standard of care created by the applicable federal regulation. Mobil was, in fact, conducting a regular 2-week right-of-way inspection of its pipeline when the accident occurred. Mobil clearly complied with those federal regulations which did apply to its pipeline.

The Department urges that, even if Mobil was not negligent, it should be liable because there is no need to find intent, fault, or negligence to establish a violation of Section 301 or 307 of the Act. The Department contends that Mobil permitted the discharge of an industrial waste into the river within the meaning of the Act and is, therefore, absolutely liable. We may not consider that contention. The Department did not plead absolute liability in its complaint, nor did it argue such a theory of liability before the EHB. It is well established that a theory of recovery suggested for the first time on appeal may not be considered. *Pegg v. General Motors Corp.,* 258 Pa. Superior Ct. 59, 391 A.2d 1074 (1978).

---

[9] 49 C.F.R. §195.412 (1975) provides:

    (a) Each carrier shall, at intervals not exceeding 2 weeks, inspect the surface conditions on or adjacent to each pipeline right-of-way.

    (b) Except for offshore pipelines, each carrier shall, at intervals not exceeding 5 years, inspect each crossing under a navigable waterway to determine the condition of the crossing.

Accordingly, we enter the following

ORDER

AND Now, this 8th day of October, 1981, that portion of the order of the Environmental Hearing Board, dated July 2, 1980, imposing a civil penalty pursuant to Section 605 of The Clean Streams Law, Act of June 22, 1937, P.L. 1987, *as amended,* 35 P.S. §691.605, on Mele Construction Company, Inc., in the amount of $3,500, is hereby affirmed; the portion of the order imposing a civil penalty on Mobil Pipe Line Company, in the amount of $5,000, is hereby reversed.